## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| -against- | ) | **1:09-cv-03125-GEL** |
| | ) | |
| **EDWARD T. STEIN,** | ) | |
| | ) | |
| **Defendant,** | ) | |
| | ) | |
| **-and-** | ) | |
| | ) | |
| **DISP, LLC,** | ) | |
| **EDWARD T. STEIN ASSOCIATES, LTD.,** | ) | |
| **G&C PARTNERSHIP JOINT VENTURE,** | ) | |
| **GEMINI FUND I, L.P.,** | ) | |
| **PRIMA CAPITAL MANAGEMENT, LLC,** | ) | |
| **VIBRANT CAPITAL CORP., and** | ) | |
| **VIBRANT CAPITAL FUNDING I LLC,** | ) | |
| | ) | |
| **Relief Defendants.** | ) | |

## RECEIVER'S INITIAL REPORT FOR THE
## PERIOD APRIL 14, 2009 THROUGH JUNE 22, 2009

H. Thomas Moran, II, as Receiver for the assets of the Defendant and Relief Defendants (the "Receiver") submits this Initial Report summarizing his activities and providing the information requested in section II(g) of the Court's April 14, 2009, Order Appointing Receiver (the "Receivership Order"). *See* Doc. No. 10. This Report covers the period from the Receiver's Appointment on April 14, 2009 through June 22, 2009.

## I.      BACKGROUND

On April 1, 2009, the United States Securities and Exchange Commission (the "SEC") filed this case (the "SEC's Action") against Defendant Edward T. Stein ("Stein") and Relief Defendants DISP, LLC; Edward T. Stein Associates, Ltd.; G&C Partnership Joint Venture; Gemini Fund I, L.P.; Prima Capital Management, LLC; Vibrant Capital Corp. and Vibrant Capital Funding I, LLC (the "Stein Entities").  Complaint, Doc. No. 1. The SEC's Action alleges that Stein violated a number of federal securities laws by moving over $55 million from an estimated 83 investors through the Stein Entities in "a classic Ponzi scheme" that spanned nearly 20 years.  *Id.* at pp. 2-7.  Instead of investing money as directed, Stein allegedly used investor money for other purposes such as funding a failed magazine venture, purchasing life settlement policies used in various transactions with the Stein Entities, paying other investors and paying personal expenses. *Id.*

The SEC immediately obtained a court order in the SEC's Action (1) preventing Stein from engaging in further violations; (2) freezing Stein's assets and those of the Stein Entities; (3) requiring Stein and the Stein Entities to submit verified accountings detailing their assets, liabilities and transactions; and (4) preventing the destruction of relevant documents and information.  *See id.* and Order Granting Preliminary Injunction and Other Relief on Consent, Doc. No. 4.  The SEC also requested the appointment of a receiver for the assets of Stein and the Stein Entities.  *See* Doc. No. 10 at ¶ I.

On April 14, 2009, the Court granted the SEC's request and appointed Mr. Moran as Receiver for the assets of Stein and the Stein Entities.  Receivership Order, Doc.

No. 10.   Mr. Moran has extensive experience serving as a court-appointed receiver in state and federal court proceedings generally, and specifically those involving life settlement policies.   The Receivership Order charges the Receiver to:

(i)     Preserve the status quo;

(ii)    Ascertain the extent of commingling of funds among [Stein and the Stein Entities];

(iii)   Ascertain the true financial condition of [Stein and the Stein Entities] and the disposition of investor finds;

(iv)    Prevent further dissipation of the property and assets of [Stein and the Stein Entities];

(v)     Prevent the encumbrance or disposal of property of the assets of [Stein, the Stein Entities] and investors;

(vi)    Preserve the books, records and documents of [Stein and the Stein Entities];

(vii)   Be available to respond to investor inquiries;

(viii)  Protect the assets of [Stein and the Stein Entities] from further dissipation;

(ix)    Determine whether the [Stein Entities] should undertake bankruptcy filings; and

(x)     Determine the extent to which the freeze should be lifted as to certain assets in the custody of [Stein or the Stein Entities].

*Id.* at ¶ 1.   The Receivership Order also directs the Receiver to report on the following matters:

1.     All assets, money, funds, securities, and real or personal property then held directly or indirectly by or for the benefit of the Defendant and the Relief Defendants, including, but not limited to, real property, bank accounts, brokerage accounts, investments, business interests, personal property, wherever situated, identifying and describing each asset, its current location and value;

2.     A list of secured creditors and other financial institutions with an interest in the receivership assets; and

3.     To the extent practicable, a list of investors in the securities sold by [Stein and the Stein Entities].

*Id.* at ¶ II(g).[1]

## II.    SUMMARY OF THE RECEIVER'S ACTIVITIES

Immediately upon appointment, the Receiver began concerted efforts to identify the property and assets of Stein and the Stein Entities (the "Receivership Estate") and to preserve and administer the Receivership Estate.  On April 16, 2009, the Receiver and Receiver's counsel traveled to New York City to meet with the SEC.  The preliminary information made available to the Receiver by the SEC indicated that the Receivership Estate principally consisted of (a) checking accounts, savings accounts, and similar liquid asset accounts owned or controlled by Stein or the Stein Entities (the "Stein Accounts") with balances totaling approximately $15,000; (b) 24 life settlement policies with a total face value over $87 million (the "Policy Portfolio"); and (c) a condominium in New York City (the "Stein Condo").

The Receiver, his counsel and the SEC also met with representatives of Ameritrans Capital Corporation ("Ameritrans"); TDC Secured Strategies, LLC ("TDC"),[2] and Diversified Resources to obtain information about their interests in the policies within the Policy Portfolio (i.e., claims of ownership or rights to the policies as collateral for transactions with certain Stein Entities) as well as the policies' status and premium requirements.  Soon thereafter, the Receiver discovered that more than $800,000 in

---

[1]    The Receivership Order originally provided for a report within 45 days of appointment, "subject to such reasonable extensions as the Court may grant."   The Court's May 27, 2009 Order Granting Receiver's Unopposed Motion for Extension of Time to File extended the time to file this initial report from May 29, 2009 to June 22, 2009.  Doc. No. 34.

[2]    TDC was formerly known as Pliny Syndications, LLC, during times relevant to the matters addressed in this Report.

premium payments for the Policy Portfolio would be due in the first 60 days following his appointment.

On April 23, 2009, the Receiver and his counsel again traveled to New York City and met with Stein and Stein's counsel to obtain information concerning the activities and assets of Stein and the Stein Entities.  The Receiver and his counsel also inspected Stein's Condo and photographed the Condo and its furnishings.  In addition, the Receiver and a member of his staff inspected and secured Stein's office and a storage facility maintained by Stein.  The Receiver's staff member worked with Meredith Spiegelman, Stein's former employee, to identify and secure relevant information at Stein's office.  The boxes of relevant documents and computer hard drives from Stein's office and the storage facility were then shipped to the Receiver's office in Oklahoma City for preservation, review and analysis.

The Receiver's staff has electronically scanned these documents, along with 38 boxes of documents provided by the SEC, using optical character recognition (OCR) software.  Documents received from investors have also been scanned in order to create integrated electronic systems for preserving, querying and retrieving information for the Receivership.

The Receiver has sent letters to all potential investors identified to date informing them of the Receivership and how to contact the Receiver and submit claim information.  The Receiver interacts with investors daily, responding to inquiries and documenting investor information for claims processing.  The Receiver has also established a website

(www.esteinreceivership.com), an investor database and a preliminary procedure for investors to submit their claims.

The Receiver is in the process of reviewing and analyzing electronically stored information and thousands of documents provided by Stein, the SEC, investors, individuals insured under the policies in the Policy Portfolio, and numerous other parties with information relevant to the Receivership Estate. The Receiver has also sent out requests, and where necessary issued subpoenas, to banks, financial institutions, actuarial firms, investment firms, and various other parties seeking additional information necessary to administer and preserve the Receivership Estate.

The Receiver has or is in the process of obtaining custody and control over the identified assets of the Receivership Estate in order to preserve and ultimately liquidate them for the benefit of the Receivership Estate. To that end, the Receiver has also taken steps to ensure that the Receivership Estate has the resources necessary to locate, collect, and properly preserve all available assets. The Receiver regularly communicates with the SEC on matters concerning the Receivership and coordinates his efforts with the SEC. The Receiver and his counsel also regularly communicate with Ameritrans and TDC concerning their transactions with the Stein Entities and the related policies.

The Receiver is also monitoring other legal proceedings of significance to the Receivership Estate. The Receiver is monitoring the criminal case brought against Stein by the United States Attorney in the United States District Court for the Eastern District of New York, *USA v. Stein,* Case No. 1:09-cr-00377-JBW. The Receiver is also aware of a class action suit filed against FISERV and TD Ameritrade on May 9, 2009, by a Stein

investor alleging that FISERV and TD Ameritrade failed to safeguard investments from Stein's alleged fraud.[3]

### III.   THE ASSESTS OF THE RECEIVERSHIP ESTATE

The Receiver has identified as major assets of the Receivership Estate the Stein Accounts, the Policy Portfolio and Stein's Condo, and the Receiver continues to look for assets of the Receivership Estate.  The Receiver is currently in the process of identifying and analyzing the various ownership interests, security interests and other potential claims to Receivership Estate's assets, but the process is convoluted and lengthy due to (1) the apparent extent of the commingling of assets between Stein and the Stein Entities; (2) the inadequate record-keeping and accounting by Stein and the Stein Entities; and (3) the repeated use of assets in the Receivership Estate as collateral for various transactions by Stein and the Stein Entities.

### A.   The Stein Accounts

The Receivership Order gives the Receiver "exclusive control of" and makes the Receiver the "sole authorized signatory" for "all accounts at any bank, brokerage firm or financial institution that has possession or control of any assets or funds of [Stein or the Stein Entities]."  Doc. No. 10 at ¶ II(b).  The Stein Accounts had minimal or negative balances at the time of the Receiver's appointment.  In accordance with the asset freeze, the balances in the Stein Accounts have remained virtually unchanged since the Receiver's appointment and total $15,744.49 as of June 22, 2009.  A schedule of the Stein

---

[3] *Shelley Anderson v. FISERV, Inc., FISERV Trust Company, TD Ameritrade Online Holding Corporation and TD Ameritrade Holding Corporation*, Case No. 09-601567 in the Supreme Court of the State on New York, County of New York; removed on June 10, 2009, to the United States District Court for the Southern District of New York, Case No. 09-cv-5400.

Accounts and their respective balances is attached as Exhibit A.  The Receiver has contacted the financial institutions and notified them of his exclusive control and authorization over the Stein Accounts pursuant to the Receivership Order.

The Receiver is currently in the process of transferring the funds in the Stein Accounts to an account established by the Receiver for the preservation and administration of the Receivership Estate (the "Receiver's Account").  A statement summarizing the activity in the Receiver's Account through June 22, 2009, is attached as Exhibit B.  As of June 22, 2009, $388,499.03 has been deposited into the Receiver's Account consisting of (1) $300,000 in funds loaned to the Receivership Estate, (2) $54,353.50 advanced to the Receiver by TDC for the Receiver to pay premiums on certain policies in the Policy Portfolio, (both discussed further in Section IV *infra*) and (3) $34,145.53 of interest payments, commissions to Stein and returned rent deposits.  *Id.* To date, $76,553.50 has been spent to pay premiums for the Policy Portfolio, including the $54,353.50 advanced by TDC as well as $22,200.00 advanced by the Receiver's Company, [4] and $37,467.00 has been spent for loan expenses.  *Id.*

## B.    The Policy Portfolio

At the outset of the SEC's Action, the Stein Entities Vibrant Capital Corp. and Vibrant Capital Funding I, LLC, filed an accounting that identified 24 life settlement policies in the Policy Portfolio with a total face value in excess of $87 million.  *See* Notice of Defendants Vibrant Capital Corp. and Vibrant Capital Funding I, LLC's

---

[4]   The Heritage Group Agency, Inc., as an affiliate of the Receiver's servicer for the policies in the Receivership Estate, advanced payment of April and May premiums to keep policies in force pending other funding or sale.  *See* Exhibit B.

Accounting of Insurance Policies, Doc. No. 5.  A life settlement transaction occurs when the owner and beneficiary of a life insurance policy sell their interest in the policy to a third party.  Thus, in a life settlement transaction, the owner of a life insurance policy receives cash to use in advance of the insured's death, and the purchaser expects to receive a higher rate of return than other investments would yield, assuming the policy matures (i.e., the insured dies) within the time frame established by a life expectancy report that is generated as part of the transaction and which is based on the insured's age, health and mortality statistics.  The rate of return for a particular life settlement transaction is driven entirely by the projected life expectancy of the insured.

Beginning in the 1990's, companies and investor groups were formed to pool money from investors and use that money to purchase pools of life settlements.  In this way, investors could participate in a pool of life settlements and thereby spread the risk that any one particular policy would not mature within its projected time frame.   In order to preserve the investment, the company or investor group must ensure that the premiums for the life settlement policies are paid so that the policies do not terminate or "lapse" before they mature.

With respect to this Policy Portfolio, unfortunately, one of the policies lapsed on the day the Receiver was appointed and two more lapsed before the Receiver could obtain sufficient information on the policies to make the overdue premium payments.  As a result, the Policy Portfolio lost three policies with a face value totaling $8.5 million. The Receiver also discovered that approximately $800,000 would be needed through July 2009 to prevent 17 policies totaling over $65 million of the Policy Portfolio from lapsing.

With only a little over $15,000 in the Stein Accounts, the Receiver's Company advanced some premium payments to prevent further policy lapses. However, the amount of premium due greatly exceeded the funds available to the Receiver and, as discussed in Section VI *infra*, the Receiver immediately pursued other resources for the short-term payment of premium until the remaining policies could be sold.

The Receiver intends to sell policies remaining in the Policy Portfolio as soon as possible. The Policy Portfolio currently consists of 21 life settlement policies with a face value of more than $78 million. A schedule listing the policies, the face values and the premiums due through July 2009 is attached as Exhibit C.

The Receiver has taken the following steps necessary to maintain, market and sell the remaining policies:

- Contacting the individual insureds or trustees for policies to advise them of the situation and obtain any available policy information;

- Obtaining information from the general agents involved with the policies concerning the status of the policies and premium payment information;

- Obtaining life expectancy reports on the insureds from actuarial firms for valuation and marketing of the policies;

- Removing Stein, Lawrence A. Garvey of Cushner & Garvey, L.L.P., and Diversified Resources as the general agents or trustees of policies; and

- Changing the ownership on certain policies to the Receiver for administration and liquidation.

The Receiver is currently in contact with one potential purchaser for 9 policies in the Policy Portfolio and is actively soliciting prospective purchasers for the remaining policies. While there are no currently pending sales, the Receiver hopes to complete the sale of at least some of the policies within the next 60-90 days.

**C.      Stein's Condo – Unit 2B of the 170 East End Avenue Condominium**

In May 2008, Stein purchased Unit 2B of the 170 East End Avenue Condominium located in Manhattan.  Stein purchased the Condo for $1.6 million and it was appraised for approximately $1.99 million.  In July 2008, Stein executed promissory notes for $417,000 and a line of credit up to $383,000 secured by mortgages on Stein's Condo (the "Mortgages").  The Mortgages are in favor of Wells Fargo Bank, N.A. ("Wells Fargo").  Stein immediately drew down on the entire line of credit.

The Mortgages on the Condo are approximately $12,000 past due through June and additional payments come due on or about July 1, 2009.  Wells Fargo considers the Mortgages in default and has sent initial foreclosure letters on Stein's Condo.  The Receiver has provided Wells Fargo with formal notice of the Receivership Estate's interest in Stein's Condo and has contacted Wells Fargo representatives concerning the Mortgages.  The Receiver has advised Wells Fargo of its intent to sell Stein's Condo as soon as possible.  The Receiver is negotiating a forbearance agreement with Wells Fargo that should result in a suspension of Wells Fargo's efforts toward foreclosure to facilitate a sale for the benefit of all interested parties.  The Receiver has also filed a lis pendens against Stein's Condo with the City Register of the City of New York City giving notice of the pendency of the SEC's Action.

The Receiver has contacted a broker to provide a market analysis for Stein's Condo and is currently negotiating a listing agreement.  The Receiver will take all reasonable and appropriate measures to preserve Stein's Condo until it can be sold for the benefit of the Receivership Estate.  While the Receiver intends to sell Stein's Condo as

soon as possible, given the current economic conditions in general, and the real estate market specifically, it is not clear exactly when or at what price Stein's Condo will be sold.

## D.    Additional Potential Assets

Stein has advised the Receiver that, prior to the commencement of the SEC's Action, he was engaged in a business venture referred to as "East West" involving business interests in the Middle East.  According to Stein, he invested approximately $800,000 in this venture in return for a 50% ownership interest and expects to see seven-figure returns over the next several months.  Stein has promised to provide information concerning the venture's management, activities and projected income to the Receivership Estate.  The Receiver has never authorized, supervised or otherwise facilitated any activities relating to the "East West" venture and provides this information solely in the interest of fully disclosing all potential sources of recovery for the Receivership Estate.

The Receiver continues to investigate any additional assets of the Receivership Estate.  For example, the Receiver obtained records from the New York State Department of Motor Vehicles concerning Stein's 2007 Mercedes E3504M.  However, those records revealed that Stein leased the Mercedes and had no ownership interest for the Receiver to pursue.  In addition, the Receiver determined that preserving the furniture and equipment in Stein's office did not benefit the Receivership Estate, and, therefore, has abandoned it to the property manager.

## IV.    SECURED FINANCING AND RECEIVERSHIP CERTIFICATES

The Receivership Order directs the Receiver to "[p]ay from available funds necessary business expenses required to preserve the assets and property of the [Receivership Estate] . . . ."  Doc. No. 10 at ¶ II(c).  As discussed in Section III.A *supra*, the Receivership Estate has never had readily "available funds" to pay expenses and preserve the Receivership Estate's assets.

In addition to the funds needed to prevent further policy lapses, the Receivership Estate required funds (1) to pay the Mortgages and other fees on Stein's Condo to preserve it while it is being marketed for sale; (2) to potentially pay premiums on the other policies in the Policy Portfolio while they are marketed for sale; and (3) for administrative and legal costs as the Receiver continues to locate, marshal and preserve the assets of the Receivership Estate.

The Receiver immediately began to pursue potential sources of funds necessary to preserve the status quo and allow for an orderly liquidation of the Receivership Estate's assets.  Although the pool of potential resources was extremely limited, Ameritrans and TDC indicated a willingness to advance funds for premium payments on certain conditions.  Yet even with these potential funds, the Receivership Estate still needed additional funds to preserve, administer and market its assets.  Consequently, the Receiver also pursued interim financing to address the Receivership Estate's financial needs.

## A.     The Credit Facility

The nature of the life settlement policies in the Receivership Estate and the general fraudulent scheme that infects all of its assets make financing on ordinary terms and from ordinary lenders virtually impossible.   The Receiver has substantial experience with obtaining financing for receiverships in general and life settlement polices in particular. The Receiver approached Bank 7, an Oklahoma-based bank, about providing interim financing to the Receivership Estate.   The Receiver has developed a relationship with Bank 7, working with Bank 7 over the years on similar receiverships with similar life settlement assets, and Bank 7 has an understanding of receiverships and life settlements that most lenders do not.   Based upon the information and alternatives available to the Receiver, he pursued obtaining a secured line of credit from Bank 7 of up to $600,000 (the "Credit Facility").

Bank 7 conditioned the availability of the Credit Facility on receiving a first position priority lien on all assets of the Receivership Estate ahead of all other creditors, lienors or other parties asserting an interest in the Receivership Estate, except Wells Fargo's Mortgages on Stein's Condo.   With respect to the rest of the Receivership Estate, Bank 7 would share pro rata with all other post-receivership creditors with similar first position priority liens.   As to Stein's Condo, Bank 7 required a second position priority lien on Stein's Condo that would be junior and inferior only to Wells Fargo's Mortgages on Stein's Condo and ahead of all other creditors, lienors or other parties asserting an interest in Stein's Condo.   Bank 7's priority lien on the Receivership Estate would be

evidenced and secured by Receiver's Certificates issued for amounts advanced under the Credit Facility.

## B.     Post-Receivership Advances by Ameritrans and TDC

Ameritrans and TDC similarly conditioned post-receivership premium payments on obtaining a priority security interest in the Receivership Estate for any funds advanced.  Ameritrans and TDC required a first position priority lien on all assets of the Receivership Estate, except Stein's Condo, to the extent of the amounts advanced and providing for a pro rata share with all post-receivership creditors having similar liens.  As to Stein's Condo, Ameritrans and TDC required a priority lien on Stein's Condo that would be junior and inferior to Wells Fargo's Mortgages and Bank 7's lien on Stein's Condo but superior to all other creditors, lienors or other parties asserting an interest in the Receivership Estate, and would share pro rata with others given a similar lien on Stein's Condo.  Ameritrans' and TDC's priority liens on the Receivership Estate would be evidenced and secured by Receiver's Certificates issued for amounts advanced to pay post-receivership premiums on the policies in the Policy Portfolio.  Ameritrans and TDC have reserved the right to stop advancing post-receivership funds at any time and without further obligation to the Receivership Estate.

With respect to Diversified Resources, in late 2008 Diversified Resources stopped paying premiums on three policies in which it may claim an interest and has indicated that it is not able to pay further premiums.  As discussed in Section III.A *supra*, the Receiver's Company advanced $22,200.00 for April and May 2009 premium payments in order to preserve these policies for the benefit of the Receivership Estate.

### C.     The Receiver's Emergency Motion

On May 15, 2009, the Receiver filed an Emergency Motion for Authorization of Secured Financing and Issuance of Receiver's Certificates (the "Emergency Motion"). Doc. No. 30.   The Emergency Motion set forth the financial condition of the Receivership Estate, the need for financing, the negotiated conditions on the potential financing and proposed Receiver's Certificates.  The Receiver requested expedited review and served the Emergency Motion on every known party believed to have an interest in the Receivership Estate or the substance of the Motion.  The Receiver consulted the SEC and counsel for Stein and informed the Court that neither objected to the Emergency Motion.

The Emergency Motion was taken up by the Honorable Naomi Reice Buchwald as the Part I Judge.  A victim of Stein's fraudulent activities, Carolyn Gilson, sent a letter objecting to the Emergency Motion based on an allegedly exclusive interest in Stein's Condo that would be irreparably prejudiced by the proposed financing and security interests.  On May 20, 2009, Judge Buchwald denied the Emergency Motion with the opportunity for the Receiver to submit additional information in support and ordered the SEC to state its position on the Emergency Motion by May 22, 2009.  *See* Doc. No. 31.

On May 22, 2009, the SEC provided the Court with its letter in support of the Emergency Motion and the Receiver resubmitted its Emergency Motion providing additional supporting information and addressing Ms. Gilson's objection.   *See* Doc. No. 33.  Ms. Gilson again objected to the Emergency Motion.  During the following week, the Receiver, his counsel, Ms. Gilson's counsel and Ms. Gilson conferred in an

effort to resolve her objection.  The parties agreed on language for a proposed order to address Ms. Gilson's concerns and they jointly presented that order to the Court on May 28, 2009.  On May 29, 2009, the Court entered its Order Authorizing the Secured Financing and the Issuance of Receiver's Certificates as requested in the Emergency Motion (the "Financing Order").  Doc. No. 36.

### D.    The Issuance of Receiver's Certificates

In accordance with the Financing Order, the Receiver and Bank 7 formally executed the loan agreements and the Credit Facility became available on June 8, 2009. The Receiver has since drawn $300,000 from the Credit Facility and issued a Receiver's Certificate to Bank 7 in that amount.  Also pursuant to the Financing Order, the Receiver issued a Receiver's Certificate to Ameritrans in the amount of $188,780.54 for post-receivership premiums paid on June 5, 2009.  To date, the Receiver has not issued any other Receivership Certificates.  However, TDC has paid $54,353.50 of post-receivership premiums as of June 22, 2009, and the Receiver anticipates issuing a Receiver's Certificate to TDC for that amount in the near future.

Funds from the Credit Facility and post-receivership premium payments by Ameritrans and TDC have provided a significant benefit to the Receivership Estate, particularly in light of the circumstances surrounding these assets, the severity of the Receivership Estate's financial needs and the time to respond.  With these funds, the Receiver was able to prevent additional policies from lapsing and to pursue a commercially reasonable sale of the life settlement policies for the benefit of the Receivership Estate.

## V.     SECURED CREDITORS AND OTHER FINANCIAL INSTITUTIONS WITH INTERESTS IN THE RECEIVERSHIP ESTATE

As discussed in Section III.C *supra*, Wells Fargo claims a security interest in Stein's Condo by virtue of the Mortgages.  Bank 7 will assert secured interests in Stein's Condo and the other assets of the Receivership Estate for the amounts drawn from the Credit Facility.  Ameritrans and TDC will assert secured interests in Stein's Condo and the other assets of the Receivership Estate for the post-receivership premiums advanced on policies in the Policy Portfolio.  A schedule summarizing the Receivership Estate's secured financing liabilities to Bank 7, TDC and Ameritrans as of June 22, 2009 is attached as Exhibit D.

The Receiver also anticipates that individual investors, Ameritrans, and TDC will assert interests as secured creditors in policies within the Policy Portfolio by virtue of pre-receivership security agreements with Stein Entities purportedly pledging certain policies as collateral.  Resolution of the validity and priority of these security interests will ultimately be resolved through a claims process and that process will likely be complicated by the use of certain policies as collateral in multiple transactions.

The Receiver has obtained information concerning a number of financial institutions that appear to have unsecured creditor claims against the Receivership Estate, *i.e.,* credit card companies and banks that extended lines of credit to Stein or the Stein Entities.  As reflected in Exhibit E, the balances on these credit accounts currently total $155,513.46.  The Receiver has contacted these financial institutions and instructed them not to permit any further activity on these accounts.

## VI.   INVESTOR INFORMATION

Shortly after his appointment, the Receiver established a website, www.esteinreceivership.com, that provides investors a central location for information on (1) the Receivership, such as the SEC's filings, the Receivership Order, and the Receiver's filings, and (2) how to submit claim information to the Receiver.   The Receiver created a Preliminary Claim Form for the submission of claims information by investors and posted that form on the Receiver's website for ease of access and use.   A sample Preliminary Claim Form is attached as Exhibit F.   The Receiver also sent letters to possible investors whose contact information was available informing them of the Receivership and providing information on how to contact the Receiver.   A sample of the Receiver's letter to investors is attached as Exhibit G.

Investors have contacted the Receiver and provided information via telephone, e-mail, letters and facsimiles.   For each identified investor, the Receiver documents the information provided, including the investor's contact information, the dates and amounts of the initial investments, the Stein Entities invested with, and the dates and amounts of any distributions the investor received.   This information is put into a database created by the Receiver to accurately and efficiently track, update and process investors' claim information.

The Receiver is currently reviewing thousands of pages of information provided by Stein, the SEC, and individual investors concerning investors' investments with Stein or the Stein Entities.   The Receiver is also analyzing financial transactions from bank statements, check copies, deposit slips, wire transfer logs, etc., to trace investor funds and

identify assets of the Receivership Estate.  The Receiver is also electronically scanning these documents using optical character recognition (OCR) software for preservation and use with computer search and reporting programs.

To date, the Receiver has identified 79 potential investors.  Many of these investors reside within the state of New York, but there are also investors located in New Jersey, Florida, Connecticut, Pennsylvania and Maryland. Preliminary information available to the Receiver indicates that there were investments totaling $30.6 million with individual investment amounts ranging from $25,000 to $2.5 million.  Of the 79 identified investors, 25 have submitted claims to the Receiver.  The claims submitted reflect a total investment of over $14.3 million with individual investment amounts ranging from $43,626 to $1.7 million.  Identified distributions for claims submitted total nearly $1.3 million and range from $7,035 to $400,000.

## VII.   FUTURE ADMINISTRATION OF THE RECEIVERSHIP ESTATE AND CLAIMS PROCEEDINGS

In light of the fact that the SEC's Action is just over 60 days old, the Receiver is not able to forecast a timetable for the administration and conclusion of the Receivership. However, the Receiver is committed to identifying and liquidating the assets of the Receivership Estate in the most prudent and expeditious manner possible.  When substantially all of the assets of the Receivership Estate have been sold or otherwise liquidated, the Receiver will ask the Court to establish a claims process, including the nature and type of notice that must be given and a bar date to assert claims, so that any party who believes they have an interest in the Receivership Estate can assert their claim

and the Court can then determine how proceeds from the Receivership Estate's assets should be distributed.

## VIII.   CLAIMS AGAINST THIRD PARTIES

The Receiver is researching and analyzing potential claims by the Receivership Estate against third parties.   The Receiver will consult with the SEC and the Court to determine whether any claims should be pursued given the potential benefit to the Receivership Estate and the potential costs of pursing such claims.

## IX.     APPLICATION FOR PAYMENT OF FEES AND EXPENSES

Contemporaneously with the filing of this Report, the Receiver and Receiver's Counsel have submitted motions seeking the approval of their fees and expenses for the month of April 2009 (the "Fee Motions").   *See* Doc. Nos. 38 and 39.   The Fee Motions are incorporated by reference into this Report, and as set forth in each Motion, the Receiver and the Receiver's counsel believe that the fees and expenses itemized in the Motions are reasonable.   Accordingly, for the reasons set forth in this Report and the Fee Motions, the Receiver respectfully requests that the Court enter an order approving the payment of those fees and expenses.

Respectfully submitted,


*/s/ Melvin R. McVay*
Melvin R. McVay, Jr. (admitted pro hac vice)
**PHILLIPS MURRAH P.C.**
Corporate Tower, Thirteenth Floor
101 North Robinson Avenue
Oklahoma City, OK 73102
Telephone: (405) 235-4100

ATTORNEYS FOR RECEIVER,
H. THOMAS MORAN, II

00397185.DOC

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on June 22, 2009, I served a copy of the *Receiver's Initial Report for the Period April 14, 2009 through June 22, 2009* in this action by electronic transmission to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Brian Edward Maas
Frankfurt Kurnit Klein & Selz, P.C.
488 Madison Avenue
New York, NY  10022
(212) 705-4836
Fax:  (212) 593-9175
bmaas@fkkslaw.com
*Attorneys for Edward T. Stein*

and

Nancy A Brown
Securities & Exchange Commission (3 WFC)
3 World Financial Center, Room 4300
New York, NY 10281
212-336-1023
Fax: (212)-336-1322
brownn@sec.gov


Stephen Arthur Larson
Securities & Exchange Commission (3 WFC)
3 World Financial Center, Room 4300
New York, NY 10281
(212) 336-0142
Fax:  (212) 336-1317
larsonst@sec.gov
*Attorneys for Securities and*
*Exchange Commission*


                                                */s/ Melvin R. McVay*