UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,         ) | |
| ) | |
| Plaintiff,         ) | |
| ) | |
| -against-         ) | 1:09-cv-03125-RJS |
| ) | |
| EDWARD T. STEIN,         ) | |
| ) | |
| Defendant,         ) | |
| ) | |
| -and-         ) | |
| ) | |
| DISP, LLC,         ) | |
| EDWARD T. STEIN ASSOCIATES, LTD.,         ) | |
| G&C PARTNERSHIP JOINT VENTURE,         ) | |
| GEMINI FUND I, L.P.,         ) | |
| PRIMA CAPITAL MANAGEMENT, LLC,         ) | |
| VIBRANT CAPITAL CORP., and         ) | |
| VIBRANT CAPITAL FUNDING I LLC,         ) | |
| ) | |
| Relief Defendants.         ) | |

**RECEIVER'S MOTION TO ESTABLISH CLAIMS PROCEDURE
PLAN AND TO APPROVE CLAIM FORMS AND BRIEF IN SUPPORT**

H. Thomas Moran, II, as Receiver for the assets of the Defendant and Relief Defendants (the "Receiver") hereby moves this Court for the entry of an Order Establishing a Claims Procedure Plan and Approving Claim Forms. In support of this Motion the Receiver states and alleges as follows:

## I. STATUS OF THE RECEIVERSHIP AND THE PROPOSED CLAIMS PROCEDURE PLAN

1. On March 31, 2009, the United States filed a criminal complaint against Defendant Edward T. Stein ("Stein") for allegedly running a Ponzi scheme that spanned nearly 20 years (the "Criminal Case").[1] On April 1, 2009, the United States Securities and Exchange Commission (the "SEC") filed this case (the "SEC Action") against Stein and Relief Defendants DISP, LLC; Edward T. Stein Associates, Ltd.; G&C Partnership Joint Venture; Gemini Fund I, L.P.; Prima Capital Management, LLC; Vibrant Capital Corp. and Vibrant Capital Funding I, LLC (the "Stein Entities"). Complaint, Doc. No. 1.

2. The SEC Action alleged that Stein violated a number of federal securities laws by moving over $55 million from an estimated 83 investors through the Stein Entities in "a classic Ponzi scheme." *Id.* at pp. 2-7. Instead of investing money as directed, the SEC alleged that Stein used investor money for other purposes such as funding a failed magazine venture, purchasing life settlement policies used in various transactions with the Stein Entities, paying other investors and paying personal expenses. *Id.*

3. The SEC also requested the appointment of a receiver for the assets of Stein and the Stein Entities, and on April 14, 2009, the Court granted the SEC's request and appointed Mr. Moran as Receiver for the property and assets of Stein and the Stein Entities (the "Estate"). *See* Doc. No. 10 (the "Receivership Order") at ¶ I.

---

[1] *U.S. v. Stein,* Case No. 1:09-cr-00377-JBW in the United States District Court for the Eastern District of New York.

4. The Receivership Order charges the Receiver, among other things, to: (1) "[t]ake and retain immediate possession and control of all assets and property, and all books, records, and documents of [Stein and the Stein Entities];" (2) "[a]scertain the extent of commingling of funds among [Stein and the Stein Entities];" (3) "[l]ocate any assets that may have been conveyed to third parties or otherwise concealed; and (4) [d]evelop a preliminary plan for the administration of the assets of [Stein and the Stein Entities]." *Id.* at ¶¶ II.

5. The Receivership Order further authorizes the Receiver to "[t]ake such further action as the Court shall deem equitable, just and appropriate under the circumstances upon proper application of the [R]eceiver." *Id.*

6. On June 22, 2009, Stein pled guilty to the charges against him in the Criminal Case, and the SEC obtained a partial judgment of consent against Stein in this action on September 14, 2009. *See* Judgment as to Edward T. Stein, Doc. No. 64 (the "SEC Judgment"). On February 2, 2010, Stein was sentenced in the Criminal Case and a Judgment ordering the restitution of $46,396,373.08 was entered against Stein on February 25, 2010.

7. To date, 93 preliminary investor claims submitted to the Receiver indicate investment losses totaling over $46.22 million with individual loss claims ranging from $25,000 to $4.7 million. However, the information available to the Receiver independent of claim submissions indicates that investors may have Stein-related investment losses

totaling more than $60 million with individual investment losses ranging from $8,332 to $11 million.[2]

8. The Receiver currently expects that the remaining assets of Stein and the Stein Entities, if distributed on a *pro-rata* basis,[3] will permit each investor ("Investor") to receive a portion of his or her investment with Stein or the Stein Entities. However, it is not known, nor can it yet be determined, what amount of assets will be available for distribution to Investors.[4]

9. Based upon available information regarding the operations and financial condition of Stein and the Stein Entities, the Receiver submits the following Claims Procedure Plan for approval by the Court:

>  a. An "Investor Claim" will be defined as the amount actually invested less any distributions paid to the Investor and will be calculated according to the "net investor method." *See SEC v. Byers,* 637 F. Supp. 2d 166, 171-72 (S.D.N.Y. 2009). Under this method, any cash distributions received prior to appointment of the Receiver would be subtracted from the total amount invested and that would be the basis for the *pro rata* distribution. For

---

[2] For example, the Judgment entered in the Criminal Case ordered Stein to pay restitution to various investors totaling $46,396,373.08. *See* Doc. No. 54 in *U.S. v. Stein,* Case No. 1:09-cr-00377-JBW in the United States District Court for the Eastern District of New York. In addition, Carolyn Travis Gilson has not submitted a claim to the Receiver despite alleging that Stein stole approximately $11 million from her during the time he operated his Ponzi scheme. *See* Doc. No. 129. Finally, the Receiver has information indicating an additional $2.94 million in potential losses suffered by approximately 20 investors that have not submitted claims.

[3] "[T]he Second Circuit has explicitly held that 'the use of a pro rata distribution has been deemed especially appropriate for fraud victims of a Ponzi scheme, in which earlier investors' returns are generated by the influx of fresh capital from unwitting newcomers rather than through legitimate investment activity.'" *SEC v. Byers,* 637 F.Supp.2d 166, 176-77 (S.D.N.Y. 2009) (quoting *SEC v. Credit Bancorp, Ltd.,* 290 F.3d 80, 89 (2d Cir. 2002).

[4] As discussed in the Receiver's Fourth Report, the amount recovered for potential distribution will ultimately be determined by a number of contingencies, most significantly the progression of recovery in the Ancillary Action and similar efforts to recover from third parties. *See* Doc. No. 144 at pp. 13-15 and 19.

example, if Investor X invested $100,000 and received distributions of $40,000, the Investor Claim for Investor X would equal $60,000.

    i. For those Investors who "rolled over" distributions instead of or in addition to receiving cash distributions, the amount rolled over will be treated as a loss in addition to the amount actually invested. For example, Investor Y made a $100,000 investment and instead of taking a $25,000 cash distribution, he reinvested that $25,000 back into his investment with Stein or the Stein Entities. The "Investor Claim" for Investor Y would equal $125,000. As another example, Investor Z invested $100,000, later took a $30,000 cash distribution and finally reinvested or "rolled over" a $50,000 distribution. The "Investor Claim" for Investor Z would equal $120,000.

b. A "Non-Investment Creditor Claim" will be defined as a claim against Stein or the Stein Entities by *bona fide* third-party non-investor creditors ("Creditors") for goods and/or services provided to Stein or the Stein Entities and for which the creditor has not been paid.

c. The Receiver will handle all aspects of the Claims Procedure Plan and the review and processing of claims. Where necessary and appropriate, the law firm of Phillips Murrah P.C. will assist the Receiver in these efforts.

d. An "Investment Claim Form" and instructions, substantially similar to the forms attached hereto as Exhibit 1, will be sent, via certified mail and regular mail with postage prepaid, to every person believed to be an Investor. This Investment Claim Form will be used by all Investors to file a claim detailing the amount invested and distributions received or "rolled over." The Investor Claim amounts will not include (1) projected or purported returns on investments; or (2) any claim to interest on the investments.

e. A "Non-Investment Claim Form" and instructions, substantially similar to the forms attached hereto as Exhibit 2, will be sent, via certified mail and regular mail with postage prepaid, to any *bona fide* potential third-party claimant believed to be a Creditor at such time as those potential Creditors are identified by the Receiver. The Creditor Claim amounts will be limited to the amounts originally owed and will not include interest, late fees or penalties.

f. As reflected on the attached claim forms, all Investors and Creditors will be required to provide specified documentation evidencing the dollar amount of any claim. In cases where such documentation is held by a third party (e.g. a broker who facilitated the investment or the custodian of a

5

retirement account), it will be the responsibility of the Investor or Creditor to obtain the documentation from that third party and forward copies of the required documentation to the Receiver along with completed claim forms.

g.  A cover letter explaining the Claims Procedure (the "Notice Letter") will be sent to all potential claimants, along with appropriate claim forms. The Notice Letter will be substantially similar to the sample letter attached hereto as Exhibit 3.

h.  The Notice Letter will state that the all claim forms must be received by the Receiver **no later than September 30, 2010** and that failure to timely return the completed claim forms may be grounds for the disallowance of the claim by the Court in whole or in part.

i.  Mailing of the Notice Letter will be completed within one week of the Court's approval of a Claims Procedure Plan.

j.  In addition to the Notice Letter, the Receiver will arrange for the publication of the Notice of Claims Procedure attached hereto as Exhibit 4 in the New York Times, a newspaper of general circulation in New York and one in which the Court has previously approved the publication of notices of general interest concerning the Estate. *See e.g.,* Order Approving Notice of Sale, Establishing Deadline and Appointing Appraisers, Doc. No. 67, Order Approving Notice of Sale and Establishing Deadline, Doc. No. 75, and Order Approving Notice of Sale and Establishing Deadline, Doc. No. 120. Publication of the Notice of Claims Procedure will be made within one week of the Court's approval of a Claims Procedure Plan.

k.  To further supplement the notice provided by the Notice Letter and the newspaper publication, the Receiver will also post copies of the Claims Procedure Plan, the Notice Letter, the Investment Claim Form and the Non-Investment Claim Form on the Receivership Website, http://www.esteinreceivership.com, to facilitate on demand access by Investors and Creditors.

l.  When a completed claim form is received, an acknowledgment letter substantially similar to the example letter attached hereto as Exhibit 5 will be sent to the Investor or Creditor.

m.  If processing a claim form requires further information from a claimant (Investor or Creditor), the Receiver shall contact the claimant and the time and date of the telephone call (or other appropriate form of communication to the claimant) shall be recorded and maintained by the person making such contact and requesting the information. The claimant will be informed

    via the Notice Letter, and by anyone requesting additional information on behalf of the Receiver, that any additional information, including documentation, requested must be provided **within twenty (20) days** after the request for such information is made. Failure to timely provide the requested information may be grounds for the Receiver to recommend to the Court that the claim be disallowed in whole or in part. Furthermore, if the requested information is not provided by the claimant, the Receiver will have the right to utilize any records in the possession of the Receiver related to the Estate to establish the amount of those portions of a claim that the Receiver moves to allow or disallow, as discussed below.

n. In situations where the original claimant's rights have been transferred by operation of law[5] or by voluntary transfer, the Receiver will process the claims submitted by the current owner of the claimant's rights. A lack of documentation supporting the claimant's assertion of ownership of those rights will be grounds for the Receiver to recommend that the Court disallow the claim. In addition, information indicating that any voluntary transfer was not made by a *bona fide* contract or agreement will be grounds for the Receiver to recommend that the Court disallow the claim.

o. Once processing of the completed claim forms by the Receiver begins, the Receiver will begin filing periodic Motion(s) to Allow Claims which have been reviewed and verified. If no objection to the proposed claim(s) is lodged **within fourteen (14) days** after the filing of a Motion to Allow Claims, the Court may enter an order allowing the particular claim(s), in the amounts set forth in the Motion.

p. A ruling by the Court that a claim is "Allowed" will not guarantee the dollar amount of that claim will be paid to the claimant, but will, instead, indicate the Allowed dollar amount of the claim that will be used as a basis for calculating the claimant's entitlement to any future distribution, pro rata or otherwise, from the Estate. In addition, the allowance of a claim will not, in and of itself, establish any priority with respect to the ultimate payment on the claim. Any priority of payment will be established by the future Order(s) of the Court.

q. The Receiver will also file periodic Motion(s) to Disallow Claims. Objections to any such Motions shall be due within the time for responding to motions provided by the Court's rules or by other objection deadlines established by the Court.

---

[5] The phrase "operation of law" would include, for example, obtaining those rights through divorce, an estate decree, court award, attachment or garnishment.

## II.   **MEMORANDUM IN SUPPORT OF THE PROPOSED CLAIMS PROCEDURE PLAN**

In general, this Court has broad authority to craft remedies for violations of the federal securities laws. *S.E.C. v. Byers,* 637 F. Supp. 2d 166, 174 (S.D.N.Y. 2009). A court imposing a receivership assumes custody and control of all assets and property of the subject receivership, and may issue all orders necessary for the proper administration of the receivership estate. *See S.E.C. v. Wencke*, 622 F.2d 1363, 1370 (9th Cir. 1980) *and Eller Indus., Inc. v. Indian Motorcycles Mfg*., 929 F. Supp. 369, 372 (D. Colo. 1995). The receiver serves as the court's agent in collecting, maintaining, administering and disposing of the property of the receivership estate. *Wencke,* 622 F.2d at 1369; *see also F.T.C. v. Five Star Auto Club, Inc.*, No. Civ.A. CIV-99-1693, 2000 WL 1609798 (S.D.N.Y., June 12, 2000) (order directing receiver to take control of and dispose of assets). The Court is vested with broad discretionary authority to enter such orders as may be appropriate and necessary for the Receiver to perform his duties and responsibilities to preserve and maintain the property and funds within the receivership estate. *See SEC v. Basic Energy & Affiliated Resources, Inc.*, 273 F.3d 657, 668 (6th Cir. 1996) and *Wencke,* 622 F.2d at 1370.

The development and implementation of a claims procedure is central to the purpose of the Receivership -- to manage and distribute the receivership assets for the benefit of all investors and creditors:

> The fundamental purpose of every receivership is to place the property involved in litigation under control of the court so that it may be preserved and held ready for disposal in accordance with the final adjudication of the rights of the interested parties. . . . The reception and adjudication of claims

> and interests involves a marshaling of all the assets, which in itself may be an extensive and complicated process, in which the receiver may be considered as an active participant....

65 AmJur.2d Receivers § 181 (*citing, inter alia, Union Trust Co. of New York v. Illinois Midland Ry. Co.*, 117 U.S. 434, 6 S. Ct. 809, 29 L. Ed. 963 (1886)).

Pursuant to the equitable principles governing federal equity receivership matters and receivership matters in general, the Receiver believes that the Claims Procedure Plan outlined above is an efficient and equitable method to facilitate the determination of allowed claims and the eventual distribution of the Estate's assets, or the proceeds thereof, to the Investors and Creditors.

### A. INVESTOR CLAIMS MUST BE EXCLUSIVE OF PROJECTED RETURN ON INVESTMENT OR INTEREST ON THE AMOUNT INVESTED

Prior to the appointment of the Receiver, the assets of the Estate had been diminished such that despite efficient management and/or sale of the remaining assets by the Receiver, the Investors will not receive even the entire dollar amount of their investments in Stein or the Stein Entities. Therefore, claims should be limited to the amounts invested and should not include amounts reflecting any expected return on Investment.

The Court's consideration of the Proposed Plan is "guided by the principle that, in cases such as these, 'equality is equity.'" *SEC v. Byers,* 637 F.Supp.2d 166, 176 (S.D.N.Y. 2009) (quoting *Cunningham v. Brown,* 265 U.S. 1, 13, 44 S.Ct. 424 (1924) (holding, in the original Ponzi scheme case, that the circumstances of Charles Ponzi's scheme "call strongly for the principle that equality is equity")). In approving a plan

similar to that proposed in this Motion, the *Byer*s court observed:

> Many of the objections are made by investors attempting to assert a superior claim to the receivership *res* so that they can recoup their entire investment. This is not surprising, and anyone in the unfortunate--and, in some cases, desperate--situation as the investors would undoubtedly do the same. For a District Court sitting in equity, however, it is important to remember that each investor's recovery comes at the expense of the others. As the Second Circuit has acknowledged, "[w]hen funds are limited, hard choices must be made." *Official Committee of Unsecured Creditors of WorldCom, Inc.,* 467 F.3d at 84 (internal citation and quotations omitted). Such is the case here, and the choices are indeed hard.

*Id.*

The Receiver anticipates that many Investors might otherwise seek to maximize their recovery from the Estate over certain other Investors based on a number of arbitrary factors such as: (1) the duration of their investment purportedly entitling them to receive a legitimate rate of return on their investment, particularly in reliance on false statements as to the value of their investments disseminated by Stein in the course of his Ponzi scheme; (2) their investment in one Stein Entity, *e.g.,* Vibrant Capital Corporation, entitling them to a different level of recovery relative to Investors that invested in another Stein Entity, *e.g.,* Gemini Fund I, L.P.; or (3) the purported ability to "trace" their investments to specific funds and, thus entitlement to a greater level of recovery than Investors who are unable to trace their funds.  However, these arguments have been consistently rejected by Courts approving plans in Ponzi scheme cases for reasons that apply with equal force in this case. *See* Byers, 637 F. Supp. 2d at 176-181.

First, the very nature of Ponzi schemes in general, and the present Ponzi scheme to which Stein pled guilty to running in particular, precludes the possibility of any

legitimate return on investments with Stein or the Stein Entities. *See In re Canyon Systems Corp.,* 343 B.R. 615, 629 (Bkrtcy. S.D. Ohio 2006) ("[a] Ponzi scheme is a fraudulent investment arrangement under which an entity makes payments to investors from monies received from new investors rather than from profits generated by legitimate business operations, although investors may believe an actual business exists from which profits are derived") and *Byers,* 637 F. Supp. 2d at 176-77 (same). Therefore, the Receiver does not believe that the length of time which certain Investors may have been invested with Stein, or the fictitious appreciation of their investments represented to them during that time, is a logical, reasonable or equitable basis for any Investors to claim more than the amounts actually invested (less any funds actually distributed as fictitious profits, if applicable).

Second, all of the Investors are "similarly situated" with respect to the defrauder, Stein, regardless of which particular Stein Entity they believed themselves to be invested in, what they believed the nature of that investment to be, or what specific misrepresentations Stein made to individual Investors to initiate or continue their investments. *See* Byers, 637 F. Supp. 2d at 177 (citing *SEC v. Credit Bancorp, Ltd.,* 290 F.3d 80, 88-89 (2d Cir. 2002)). Plans such as the one proposed in this Motion are appropriate and "equitable when the separate legal entities were involved in a unified scheme to defraud." *See SEC v. AmeriFirst Funding, Inc.,* 2008 WL 919546, at *4 (N.D. Tex., Mar. 13, 2008).

Third and finally, "tracing analysis . . . has been almost universally rejected by courts as inequitable." *Byers,* 637 F. Supp. 2d at 177 (citing *United States v. 13328 &*

11

*13324 State Highway 75 N.,* 89 F.3d 551, 553 (9th Cir.1996) (holding that tracing would "frustrate equity"); *United States v. Durham,* 86 F.3d 70, 73 (5th Cir. 1996) (holding that "following the tracing principle would be inequitable") and *SEC v. Elliott,* 953 F.2d 1560, 1569 (11th Cir.1992) (rejecting tracing as inequitable)).  This is because in Ponzi scheme cases "whether at any given moment a particular customer's assets are traceable is 'a result of the merely fortuitous fact that the defrauders spent the money of the other victims first.'"  *Credit Bancorp,* 290 F.3d at 89 (quoting *Durham*, 86 F.3d at 72).   In addition, tracing analysis is particularly inappropriate and inequitable in this case given the degree of commingling of Investor funds between the various Stein Entities. *See e.g.,* Declaration of Doreen Piccirrillo, Doc. No. 9-1 at ¶¶ 29-34 and Receiver's Fourth Report, Doc. No. 144, at p. 16; *see also Byers,* 637 F. Supp. 2d at 177 (approving a *pro rata* distribution based on the net investor method, in part, because "there [was] some evidence that commingling occurred") and *CFTC v. Eustace,* 2008 WL 471574, at *7 (E.D. Pa. Feb. 15, 2008) (similarly approving a plan even where evidence of commingling was "not necessarily systematic").

     Based on these considerations, the Receiver believes that the only reasonable and equitable manner for Investor claims to be submitted is with the exclusion of any purported return on investment or interest.  Investor claims reflecting only the actual amount of funds invested, less any actual distributions of funds to Investors, are necessary to facilitate the analysis of the claims under the "net investor method" proposed above and the equitable distribution that is the goal of this Receivership.

### B.   CREDITOR CLAIMS MUST BE EXCLUSIVE OF INTEREST, LATE FEES OR PENALTIES

Given the available Estate assets, the Creditors will likewise not receive the entire dollar amount of the goods and services provided to Stein or the Stein Entities. Therefore, claims of Creditors should be determined based upon the original amount owed and should not include claimed interest, late fees or penalties. The treatment of claims by creditors on equal footing with defrauded investors was specifically considered and approved by the *Byers* court under similar circumstances. *See* 637 F. Supp. 2d at 171. The Receiver believes that the limitation of Creditor claims to amounts originally owed, exclusive of interest, late fees or penalties, is equitable and appropriately places Creditors on equal footing with Investors for recovery from the Estate's limited assets.

### C.   DOCUMENTATION REQUIREMENTS FOR CLAIMS

The proposed Claims Procedure Plan is an attempt to minimize the costs associated with processing claims and to maximize the amount of Estate assets available for distribution. Requiring the Investor or Creditor to obtain any documentation held by third parties and forward the documentation to support a claim will reduce potential additional costs to be deducted from the available Estate assets.

### D.   THE CLAIMS PROCESS SHOULD BEGIN IN A TIMELY MANNER FOLLOWING THE COURT'S RULING ON THIS MOTION

The Receiver proposes to begin mailing the Notice and claim forms to the Investors and Creditors within one week of the Court's ruling on this Motion. Should the Court deny this Motion, the proposed Claim Procedure Plan is likely to require some

modification to take into account the possibility of a distribution plan based upon a methodology other than that proposed herein.

## CONCLUSION

WHEREFORE, premises considered, H. Thomas Moran, II, Receiver, moves this Court, in the interest of the efficient and effective administration of the Receivership Assets for the benefit of the Investors, for an Order approving the Claims Procedure Plan outlined herein and approving the forms attached hereto as Exhibits 1-5.  The Receiver further prays for such other equitable and legal relief as may be reasonable and necessary to effectuate the intent and purpose of this Motion.

Respectfully submitted,

*/s/ Melvin R. McVay, Jr.*
Melvin R. McVay, Jr. (admitted pro hac vice)
**PHILLIPS MURRAH P.C.**
Corporate Tower, Thirteenth Floor
101 North Robinson Avenue
Oklahoma City, OK 73102
Telephone: (405) 235-4100

ATTORNEYS FOR RECEIVER,
H. THOMAS MORAN, II

00484425.DOC

**CERTIFICATE OF SERVICE**

  I hereby certify that on August 4, 2010, I served a copy of the above and foregoing document in this action by electronic transmission to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Brian Edward Maas
Frankfurt Kurnit Klein & Selz, P.C.
488 Madison Avenue
New York, NY  10022
(212) 705-4836
(212) 593-9175 Facsimile
bmaas@fkkslaw.com
*Attorneys for Edward T. Stein*

Nancy A Brown
Securities & Exchange Commission (3 WFC)
3 World Financial Center, Room 4300
New York, NY 10281
(212) 336-1023
(212) 336-1322 Facsimile
brownn@sec.gov

Stephen Arthur Larson
Securities & Exchange Commission (3 WFC)
3 World Financial Center, Room 4300
New York, NY 10281
(212) 336-0142
(212) 336-1317 Facsimile
larsonst@sec.gov
*Attorneys for Securities and Exchange Commission*

Katherine L. Villanueva
Drinker Biddle & Reath, LLP
One Logan Square, 18th and Cherry Streets
Philadelphia, PA  19103
(215) 988-2700
(215) 988-2757 Facsimile
katherine.villanueva@dbr.com
*Attorneys for Hartford Life and Annuity Insurance Company*

                /s/ Melvin R. McVay